# Case: Merle Atkins v. M & S Acquisition, et al.

Volume No.

## Transcript of the Testimony of Mark Santasiero

**Date:** October 20, 2010



**GorePerry**
Reporting & Video

515 Olive Street, Suite 700
St. Louis, MO 63101
Phone: 314.241.6750
1-800-878-6750
Fax: 314.241.5070
Email: schedule@goreperry.com
Internet: www.goreperry.com



EXHIBIT B

Case: 4:09-cv-01923-CAS   Doc. #: 41-2   Filed: 11/17/10   Page: 2 of 4 PageID #: 515

Merle Atkins v. M & S Acquisition, et al.
Mark Santasiero                                          10/20/2010

Page 6

1   MARK W. SANTARSIERO,
2   of lawful age, having been first duly sworn to testify
3   the truth, the whole truth, and nothing but the truth
4   in the case aforesaid, deposes and says in reply to
5   oral interrogatories propounded as follows, to wit:
6                    EXAMINATION
7   **QUESTIONS BY MR. HETLAGE:**
8       Q: Mr. Santarsiero, my name is Laird Hetlage
9   and we've met at Merle's deposition. Have you given a
10  deposition before, sir?
11      A: I have.
12      Q: And so you're familiar with the rules and
13  I'm sure your attorney's explained the rules today.
14  Are you comfortable with that situation?
15      A: Yes, I am.
16      Q: All right. Would you state your name for
17  the record, sir?
18      A: Mark William Angelo Santarsiero.
19      Q: Where do you reside, sir?
20      A: In Huntington Beach, California.
21      Q: What's the address?
22      A: 19616 Dearborne Circle.
23      Q: And the zip code there?
24      A: 92648.
25      Q: What's your date of birth, sir?

Page 7

1       A: 9/6/58.
2       Q: And your Social Security number?
3       A: 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.
4       Q: What's your educational background,
5   Mr. Santarsiero?
6       A: I have an undergraduate degree in accounting
7   from the University of Scranton, graduate degree, MBA
8   from University of Southern California.
9       Q: Any additional education after the MBA?
10      A: I have taken some courses at Harvard USC
11  relative to running service organizations, corporate
12  government, things of that nature.
13      Q: Are you a CPA?
14      A: I am a retired CPA or a non-active in
15  California.
16      Q: Do you have any other designations in any
17  other type of financial designations?
18      A: I've got retired CPA certificates in
19  Pennsylvania and New Jersey, but no other
20  designations.
21      Q: All right. What's your current employment
22  or what's your current position with Marshall and
23  Stevens, Inc.?
24      A: I am currently the president and CEO of
25  Marshall and Stevens.

Page 8

1       Q: What are your duties in those positions?
2       A: Set the direction of the company, work with
3   the individuals to make sure that we're working
4   towards that direction and goals of the company and
5   working with clients and in general overseeing
6   operations.
7       Q: Now, are you on the board of directors of
8   Marshall and Stevens, Inc. also?
9       A: Yes, I am.
10      Q: In any of those capacities, do you decide
11  who gets terminated, hired, retained as employees?
12      A: Yes.
13      Q: And do you determine employee's salaries and
14  bonuses and incentives in that position?
15      A: In conjunction with others, yes.
16      Q: Who determines your salary and bonus
17  incentive structure for Marshall and Stevens, Inc.?
18      A: Me personally?
19      Q: Yeah.
20      A: The board of directors.
21      Q: Has that always been the case?
22      A: Prior to becoming president and CEO, no.
23      Q: Okay. And when did you become president and
24  CEO of Marshall and Stevens, Inc.?
25      A: Early 2000.

Page 9

1       Q: What was your title before that?
2       A: CFO.
3       Q: How long were you the CFO?
4       A: Since 1987.
5       Q: And when did you join -- when did you first
6   become employed with Marshall and Stevens, Inc.?
7       A: 1987.
8       Q: Now, let's go to M & S Acquisition
9   Corporation. What current positions do you hold in
10  connection with M & S Acquisition Corporation?
11      A: I'm on the board of M & S Acquisition
12  Corporation and president and CEO.
13      Q: And how long have you been president and CEO
14  of M & S Acquisition Corporation?
15      A: Same time, since early 2000.
16      Q: Now, M & S Acquisition Corporation, does
17  that own all of the ownership interest in Marshall and
18  Stevens, Inc.?
19      A: Yes.
20      Q: Does M & S Acquisition Corporation own any
21  other subsidiaries or affiliates?
22      A: Yes.
23      Q: What are those?
24      A: MS ESOP Capital Strategies, MS Real Estate
25  Finance Group. Those are the only others I can recall

Case: 4:09-cv-01923-CAS   Doc. #: 41-2   Filed: 11/17/10   Page: 3 of 4 PageID #: 516

Merle Atkins v. M & S Acquisition, et al.
Mark Santasiero
10/20/2010

Page 22

1  A: Not that I recall.
2  Q: After that did there come a time when
3  Merle's assignment changed?
4  A: Yes.
5  Q: And what was his next change of assignment?
6  A: The next one I remember was when he was put
7  in charge of the leasing group.
8  Q: Okay. Who made that decision?
9  A: Senior management.
10 Q: Who do you include in senior management?
11 Let me withdraw that and say what time frame are we
12 talking about?
13 A: 2003, 2004, generally.
14 Q: And what senior management was involved in
15 that decision?
16 A: Myself, Fred Thomas, Bob Kerslake. There
17 may have been others, but that's mainly who I recall.
18 Q: And while some of those people may have been
19 on the board of directors, it was not the board of
20 directors who made that decision; is that correct?
21 A: I don't believe it was a board decision.
22 Q: And in 2003-2004, you were the president and
23 CEO of M & S Acquisition; is that correct?
24 A: Yes.
25 Q: And why was the decision to move Merle to

Page 23

1  the leasing group made?
2  A: Because we couldn't find another place for
3  him.
4  Q: Why do you say that?
5  A: Because we had a discussion about how Merle
6  would best fit in the organization and do the least
7  amount of harm. And he had some knowledge about
8  leasing and sale lease backs, and it was a small
9  group.
10 Q: Where was the -- the leasing group, was it
11 located in a particular geographic location?
12 A: At that point in time, I believe it was
13 mainly in the northeast, but there may have been some
14 ties to Chicago.
15 Q: Did Merle's ties to Chicago have any bearing
16 on that decision?
17 A: His personal ties to Chicago?
18 Q: Yes.
19 A: No.
20 Q: And would Merle continue to work out of
21 Philadelphia or where would he work out of?
22 A: He was requested to split his time between
23 Philadelphia and New York.
24 Q: You indicated previously, I believe, that
25 Merle had some skills that were beneficial in the

Page 24

1  appraisal area. Was there any reason you had that he
2  needed to be moved from being a real estate appraiser?
3      MS. BLAISDELL: Objection. Vague.
4  A: He was disruptive with the other real estate
5  appraisers and our clients. We actually lost a major
6  client because of him.
7  Q: Who was that?
8  A: MGM.
9  Q: Was Merle later moved from the leasing
10 group?
11 A: I believe the leasing group, for the most
12 part, was disbanded.
13 Q: Why was that?
14 A: There were regulatory reasons why sale lease
15 backs were no longer viable.
16 Q: What division was Merle moved to after the
17 leasing group?
18 A: He became a corporate, assigned to
19 corporate.
20 Q: Did he have a position or a title?
21 A: I'm sure he did.
22 Q: What were his -- and what time frame are we
23 talking about now?
24 A: After 2004.
25 Q: What were his duties when he was assigned to

Page 25

1  corporate?
2  A: Bring in revenue and produce real estate
3  reports for his clients within Marshall and Stevens.
4  Q: How long did he remain in this capacity?
5  A: I believe until the end of 2006, early 2007.
6  Q: Was he reassigned at that time?
7  A: No.
8  Q: What happened then?
9  A: He remained a real estate appraiser until
10 his termination of employment.
11 Q: Was there a time when he was assigned to the
12 structured finance division?
13 A: That's what I was referring to as the
14 leasing group.
15 Q: Ah, okay. At the end of 2007, what became
16 of his employment with Marshall and Stevens?
17 A: He was asked to change his status to a
18 subcontractor status.
19 Q: Okay. Was it you who asked him to do that?
20 A: Yes. I gave him the option.
21 Q: What was that option you gave him?
22 A: Terminate employment or become a
23 subcontractor.
24 Q: And who made the decision to give him that
25 option?

Case: 4:09-cv-01923-CAS   Doc. #: 41-2   Filed: 11/17/10   Page: 4 of 4 PageID #: 517

Merle Atkins v. M & S Acquisition, et al.
Mark Santasiero                                      10/20/2010

## Page 26

1  A: Senior management.
2  Q: Who's senior management?
3  A: Myself, Bob Kerslake, Craig Thompkins.
4  Q: Anyone else?
5  A: Not that I remember.
6  Q: Why was that decision made?
7  A: Because he wasn't being productive in line
8  with what we were paying him, and he was a general
9  negative influence in the northeast.
10 Q: How did Craig Thompkins become involved in
11 Marshall and Stevens?
12    MS. BLAISDELL: Objection. Vague and
13 ambiguous.
14 A: During what time frame?
15 Q: Well, what was Craig Thompkins' first
16 relationship with Marshall and Stevens?
17 A: As a client.
18 Q: Who did he work for?
19 A: Reading International.
20 Q: What did he do for them?
21 A: I don't know his specific title or duties.
22 But in general, he was involved with transactions, and
23 that's how we knew him.
24 Q: When did he first join Marshall and Stevens
25 either as a shareholder or employee, director,

## Page 27

1  officer, anything like that?
2  A: I'm going to say 2008. I'm a little vague
3  on the dates.
4  Q: Well, obviously, if he was involved in the
5  decision to either terminate or make Merle a
6  subcontractor in late 2007, your dates must be off.
7  A: Well, I thought your question was when did
8  he become a board member.
9  Q: No. I asked when did he become involved in
10 Marshall and Stevens as an employee, director, any
11 role.
12 A: He was an advisor, unpaid.
13    MS. BLAISDELL: We need to go off the record
14 for a second. All right.
15    (Discussion off the record).
16 Q: Other than with being a client, when is the
17 first time that Craig Thompkins had any role in
18 connection with Marshall and Stevens or M & S
19 Acquisition either as a vendor, advisor,
20 subcontractor, employee, officer, anything other than
21 client?
22 A: After being a client, he remained interested
23 in Marshall and Stevens and became a personal advisor
24 to me relative to transactions and company matters.
25 When he became an investor is when he became more

## Page 28

1  actively involved in the operations of the company,
2  and then subsequent to that became a board member,
3  chairman of the board, and then executive chairman of
4  the board.
5  Q: When did he become an investor?
6  A: I don't remember the specific date, but I'm
7  sure it's --
8  Q: Do you know if it was before the end of
9  2007?
10 A: I don't recall.
11 Q: You indicated that he acted as a personal
12 advisor for some period of time. Did you pay him any
13 compensation?
14 A: As a personal advisor?
15 Q: Right.
16 A: No.
17 Q: Did you pay him any fee for any legal advice
18 prior to January 31st of 2008?
19 A: No.
20 Q: Mr. Thompkins, is he a licensed attorney?
21 A: I believe so.
22 Q: Did you ask him for legal advice before
23 January 31, 2008?
24 A: No.
25 Q: Now, going back to Merle Atkins' termination

## Page 29

1  in 2007, during your discussion in which you presented
2  to him this option of being terminated or becoming a
3  subcontractor, did you discuss with him the payment or
4  the purchase of his stock interest in M & S
5  Acquisition Corporation?
6  A: In a sense; yes.
7  Q: What did you discuss regarding that?
8  A: The fact that he still had his stock.
9  Q: To the best of your recollection, can you
10 tell me specifically what was discussed regarding the
11 fact that he still had his stock?
12 A: It was in a general discussion of how he
13 would survive economically as a subcontractor with
14 Marshall and Stevens.
15 Q: Do you remember specifically what he said?
16 A: I do.
17 Q: What did he say?
18 A: He said he should kill himself.
19 Q: What else did he say about the stock?
20 A: That he would like to hold onto the stock in
21 case there was a distribution under the earnout on the
22 cost segregation sale to CBRE.
23 Q: At that time, was there still some money
24 being held from the proceeds of the sale of the
25 division to CBRE?